1  MAYER BROWN LLP
2  CARMINE R. ZARLENGA (*pro hac vice*)
   *czarlenga@mayerbrown.com*
3  1999 K Street, N.W.
   Washington, DC  20006-1101
4  Telephone: (202) 263-3000
   Facsimile:  (202) 263-3300
5
6  DALE GIALI (SBN 150382)
   *dgiali@mayerbrown.com*
7  KERI E. BORDERS (SBN 194015)
   *kborders@mayerbrown.com*
8  350 South Grand Avenue, 25th Floor
   Los Angeles, CA  90071-1503
9  Telephone: (213) 229-9500
   Facsimile:  (213) 625-0248
10
11 *Attorneys for Plaintiff 3M Company*

12             **UNITED STATES DISTRICT COURT**

13             **EASTERN DISTRICT OF CALIFORNIA**

14

15 3M COMPANY,                          Case No. 1:20-cv-00523-NONE-SAB

16              Plaintiff,              **FIRST AMENDED COMPLAINT AND
                                        DEMAND FOR JURY TRIAL**
17       vs.

18 RX2LIVE, LLC and RX2LIVE, INC.,      **JURY TRIAL DEMANDED**

19              Defendants.

20                                      Original Complaint Filed:  April 10, 2020

21

22

23

24

25

26

27

28

**COMPLAINT**

Plaintiff 3M Company ("3M" or "Plaintiff"), by and through its undersigned attorneys, as and for its Complaint against Defendants RX2Live, LLC and RX2Live, Inc. (collectively, "RX2Live" or "Defendant"), hereby alleges as follows based on knowledge of its own actions, and on information and belief as to all other matters:

**NATURE OF THE ACTION**

1.      This lawsuit concerns Defendant's use of 3M's famous trademarks to perpetrate a false and deceptive price-gouging scheme on unwitting customers and consumers, including Fresno-based healthcare provider Community Medical Centers, Inc. ("CMC"), during the global COVID-19 pandemic.

2.      Throughout its history, 3M has been providing state-of-art, industry-leading scientific and medical products to consumers throughout the world under its famous 3M marks. Based on this longstanding, continuous use, consumers associate the 3M marks uniquely with 3M. Now, more than ever, consumers are also relying on the famous 3M marks to indicate that the products offered thereunder are of the same superior quality that consumers have come to expect over the past century.  This is especially true with respect to 3M's numerous industry-leading healthcare products and personal protective equipment ("PPE"), including Plaintiff's 3M-brand N95 respirators.

3.      Healthcare professionals and other first responders are heroically placing their health and safety on the line to battle COVID-19.  To assist in the battle against COVID-19, 3M is supplying healthcare workers and other first responders with 3M-brand N95 respirators.  For example, in the last week of March 2020, 3M supplied healthcare workers throughout the United States with 10 million of its 3M-brand N95 respirators.  3M also recently announced that it will import 166.5 million of its 3M-brand N95 respirators into the United States in the next three months to supplement its U.S. production, and has invested the capital and resources necessary to double its current annual global production of 1.1 billion respirators.  In response to the COVID-19 outbreak and surge in need for N95 respirators, 3M has doubled its global output rate to nearly 100

- 1 -

million respirators per month, and it expects to produce around 50 million respirators per month in the United States by June 2020.

4.      The demand for 3M-branded respirators has grown exponentially in response to the pandemic, and 3M has been committed to seeking to meet this demand while keeping its respirators priced fairly.  3M is working with customers, distributors, governments, and medical officials to direct 3M supplies to where they are needed most.  Importantly, 3M has *not* increased the prices that it charges for 3M respirators as a result of the COVID-19 outbreak.

5.      Unfortunately, any number of wrongdoers seek to exploit the current public health emergency and prey on innocent parties through a variety of scams involving 3M N95 respirators and other products in high demand.  These scams include unlawful price-gouging, fake offers, counterfeiting, and other unfair and deceptive practices – all of which undercut the integrity of the marketplace and constitute an ongoing threat to public health and safety.

6.      In response to fraudulent activity, price-gouging and counterfeiting related to N95 respirators that has spiked in the marketplace in response to the pandemic, 3M is taking an active role to combat these activities.  3M's actions include working with law enforcement authorities around the world, including the U.S. Attorney General, state Attorneys General and local authorities to combat price-gouging.  3M has also created a website where people can report potential price-gouging and the "3M COVID-19 Fraud hotline" for end-users and purchasers of 3M products in the United States and Canada to call for information and to help detect fraud and avoid counterfeit products.  Moreover, 3M is publishing information about its anti-price-gouging and counterfeiting efforts on the 3M website, including disclosure of 3M's list prices for its N95 respirators and the web address and phone numbers that can be used to identify 3M authorized distributors and dealers in the United States and Canada.  Further information about 3M's efforts are set forth in the 3M press release and publication attached hereto as **Exhibits 1 and 2**.  This Complaint is another part of these efforts.

7.      Despite 3M's extensive efforts during COVID-19, deplorable pandemic profiteers continue their quests to take advantage of healthcare workers, first responders, and others in a time

1  of need and trade off the fame of the 3M brand and marks.  Defendant is a prime example of this

2  behavior.

3         8.      On information and belief, on or before March 26, 2020, RX2Live mobilized its

4  franchise network of 68 franchises located in California and 13 other states to offer 3M model no.

5  8210 N95 respirators supposedly "direct from 3M" to health care customers at grossly inflated

6  prices.  To do so, RX2Live equipped franchisees with a purchase order in blank indicating that N95

7  respirators would be "direct from 3M" and an accompanying price list for N95 respirators likewise

8  indicating that 3M model no. 8210 respirators were available "direct from 3M" in large quantities

9  at the grossly inflated price of $4.95 per respirator (approximately 300-400% above 3M's list price).

10  As RX2Live had no means to secure any respirators "direct from 3M" and no business relationship

11  of any kind with 3M, these representations (and any further representations based on them) were

12  false, deceptive, and harmful to 3M's trademarks, goodwill, and reputation.

13         9.      On March 27, 2020, Virginia Cooper, who is an employee or agent of Defendant

14  RX2Live, contacted CMC via email to advertise PPE products available through RX2Live,

15  including purported 3M-brand N95 respirators.  Over the next several days, Ms. Cooper perpetuated

16  the fraud by providing CMC with additional promotional materials, including a pricing list and a

17  PowerPoint presentation reflecting that both documents were last edited by a management-level

18  employee or agent of Defendant, Alex Myers.  The PowerPoint presentation provided to CMC

19  advertised the availability of "3M N95 1860" surgical respirators and "3M N95 8210" standard

20  respirators, "Direct from 3M."  *See* **Exhibits 3**, **4**.  Moreover, the PowerPoint presentation stated

21  that a minimum order of 10 million masks was required (at grossly inflated purchase prices of $52

22  million for surgical masks and $49.5 million for standard masks in contrast to 3M's list prices of

23  $12.7 million and $10.2-$13.1 million, respectively).   The PowerPoint presentation further

24  indicated that "3M requires payment in full before order can be placed.  Payment is held in escrow

25  until the order is completed."  *See* Exh. 4.  Virtually all of these statements are false, deceptive,

26  and/or unlawful.

27        10.     Defendant is not, and never has been, an authorized distributor of any of 3M's

28  products and has no rights to use 3M's famous marks.  By using 3M's famous marks in RX2Live's

promotional materials and product listing, and holding itself out to have a direct supply relationship with 3M and its products, Defendant confused and deceived consumers in the State of California (and elsewhere) by offering for purchase products at unconscionably high prices that were approximately 4-5 times *above* 3M's list prices. This offer constituted extreme price-gouging by any measure, including under California law (Penal Code § 396). Not only does such price-gouging further strain the limited resources available to combat COVID-19, but such conduct justifiably has caused public outrage which threatens imminent and irreparable harm to 3M's brand as Defendant and similar pandemic profiteers promote an improper association between 3M's marks and exploitative pricing behavior.

11.     To make matters worse, RX2Live has attempted to cover up and conceal all details relating to all sales, marketing, and financial information involving price-gouged 3M products and the use of the 3M brand through a written "Non-Circumvention, Non-Disclosure & Working Agreement" that RX2Live also provided to its franchisees. The agreement purports to bar the disclosure of the identities of anyone involved in any way in the scheme. As a consequence, the full scope of RX2Live's wrongdoing is unknown and likely cannot be determined in the absence of discovery.

12.     3M does not – and will not – tolerate individuals or entities deceptively trading off the fame and goodwill of the 3M brand and marks for their personal gain. This is particularly true against those who seek to exploit the surge in demand for 3M-brand products during the COVID-19 global pandemic which already has claimed tens of thousands of lives worldwide and over 1,000 lives in the State of California alone.

13.     Accordingly, to further protect consumers from confusion and mistake, to reduce the amount of time and energy that healthcare providers and procurement officers are forced to waste interacting with such schemes, as well as to forestall any further diminution to the 3M brand and marks' reputation, fame, and goodwill, Plaintiff brings this lawsuit against Defendant for federal and state trademark infringement, unfair competition, false association, false endorsement, false designation of origin, trademark dilution, false advertising, unlawful, unfair, and fraudulent business acts and practices. Plaintiff also seeks preliminary and permanent injunctive relief. As

described below, any damages, costs, or fees recovered by 3M will be donated to charitable COVID-19 relief efforts.

## THE PARTIES

14.    Plaintiff 3M Company is a Delaware corporation, with a principal place of business and corporate headquarters located at 3M Center, St. Paul, Minnesota 55144. 3M is a diversified technology company with a global presence and is among the leading manufacturers of products for many of the markets it serves, including PPE such as 3M-brand N95 respirators.

15.    On information and belief, Defendant RX2Live, LLC is a Utah limited liability company with its corporate headquarters and principal place of business located at 597 South Pleasant Grove Boulevard, Pleasant Grove, Utah 84062. RX2Live describes itself as a franchisor in healthcare services, which provides healthcare professionals access to products, education, and services, including workplace and senior wellness programs. RX2Live supplies a range of PPE products to hospitals and healthcare providers, including the counterfeit 3M-brand N95 respirators at issue in this action, as well as other N95 respirators, surgical masks, nitrile and PVC gloves, hand sanitizer, isolation gowns, and supposed COVID-19 test kits.

16.    On information and belief, Defendant RX2Live, Inc. is a Wyoming corporation with its principal places of business located at 5255 West 11000 North, Suite 225, Highland, Utah 84003 and 1712 Pioneer Avenue, Suite 115, Cheyenne, Wyoming 82001. On information and belief, Defendant RX2Live, Inc. acquired all of the assets of RX2Live, LLC on January 1, 2019.

## JURISDICTION AND VENUE

17.    The claims for trademark infringement, unfair competition, false association, false endorsement, false designation of origin, trademark dilution, and false advertising, respectively, asserted in Counts I – IV, *infra*, arise under the Trademark Act of 1946 (as amended; the "Lanham Act"), namely, 15 U.S.C. §§ 1051 *et seq.* Accordingly, this Court has original and subject-matter jurisdiction over Counts I – IV pursuant to 28 U.S.C. §§ 1331, 1338(a), and 15 U.S.C § 1121(a).

18.    The claims for unlawful, unfair, and fraudulent business acts or practices and false advertising in violation of California Business and Professions Code §§ 17200 *et seq.* and 17500 *et seq.*, trademark dilution, unfair competition, and trademark infringement, asserted in

Counts V – VIII, *infra*, arise under California statutory and common law, and are so related to the federal claims asserted in Counts I – IV, *infra*, that they form part of the same case or controversy. Accordingly, this Court has supplemental jurisdiction over Counts V – VIII pursuant to 28 U.S.C. §§ 1338(b) and 1367(a).  This Court also has subject matter jurisdiction on the separate and independent ground of diversity of citizenship pursuant to 28 U.S.C. § 1332(a).  There is complete diversity of citizenship between the parties and the amount in controversy exceeds $75,000, exclusive of interest and costs.

19.     Defendant RX2Live has purposefully availed itself of the privilege of transacting business within the State of California, including in this District.  RX2Live has also committed and intentionally directed tortious acts towards residents of the State of California, including in this District.  For example, RX2Live recently used 3M's famous marks as part of a price-gouging scheme to deceive CMC into believing that RX2Live was authorized by 3M to sell millions of 3M-brand N95 respirators for an aggregate price of nearly $50 million – several multiples of the 3M list price.  Plaintiff's claims arise out of and relate to RX2Live's transaction of business and tortious acts committed within the State of California, including in this District.  Based on the foregoing, this Court has long-arm jurisdiction over RX2Live pursuant to Cal. Code Civ. Proc. § 410.10 and Fed. R. Civ. P. 4(k).

20.     A substantial part of the events giving rise to the claims asserted, *infra*, occurred in this District.  Accordingly, venue is proper in this district pursuant to 28 U.S.C. § 1391(b)(2).

21.     Defendant is subject to personal jurisdiction in this District.  Accordingly, venue is also proper in this District pursuant to 28 U.S.C. § 1391(b)(3).

## FACTS COMMON TO ALL CLAIMS FOR RELIEF

**I.     Plaintiff 3M**

22.     3M has grown from humble beginnings in 1902 as a small-scale mining venture in Northern Minnesota to what it is today, namely: an industry-leading provider of scientific, technical, and marketing innovations throughout the world.  Today, 3M's portfolio includes more than 60,000 goods and services, ranging from household and school supplies, to industrial and manufacturing materials, to medical supplies and equipment.

### A. The 3M Brand

23.    3M offers its vast array of goods and services throughout the world under numerous brands, including, for example: ACE; POST-IT; SCOTCH; NEXCARE; and more. Notwithstanding the widespread goodwill and resounding commercial success enjoyed by these brands, 3M's most famous and widely recognized brand is its eponymous "3M" brand.

24.    The 3M brand is associated with products and materials for a wide variety of medical devices, supplies, PPE, including, for example: respirators; stethoscopes; medical tapes; surgical gowns, blankets, and tape; bandages and other wound-care products; and more.  As such 3M-branded products are highly visible throughout hospitals, nursing homes, and other care facilities where patients, care providers, and procurement officers value and rely upon the high quality and integrity associated with the 3M brand.

### B. The Famous "3M" Marks

25.    Over the past century, 3M has invested hundreds of millions of dollars in advertising and promoting its 3M-brand products to consumers throughout the world (including, without limitation, its 3M-brand N95 respirator) under the standard-character mark "3M" and the inset 3M design mark (together, the "3M Marks"):



26.    For decades, products offered by under the 3M Marks have enjoyed enormous commercial success (including, without limitation, its 3M-brand N95 respirator).  Indeed, in 2019, alone, sales of products offered under the 3M Marks exceeded several hundred million USD.

27.    Over the same period of time, products offered under the 3M Marks have regularly been the subject of widespread, unsolicited media coverage and critical acclaim.

28.    Based on the foregoing, consumers associate the 3M Marks uniquely with 3M and recognize them as identifying 3M as the exclusive source of goods and services offered under the 3M Marks.  Based on the foregoing, the 3M Marks have also become famous among consumers in the United States.

FIRST AMENDED COMPLAINT AND DEMAND FOR JURY TRIAL,
CASE NO. 1:20-CV-00523-NONE-SAB

29.     To strengthen 3M's common-law rights in and to its famous 3M Marks, 3M has obtained numerous federal trademark registrations, including, without limitation: (i) U.S. Trademark Reg. No. 3,398,329, which covers the standard-character 3M mark in Int. Classes 9 and 10 for, inter alia, respirators (the "'329 Registration"), and (ii) U.S. Trademark Reg. No. 2,793,534, which covers the 3M design mark in Int. Classes 1, 5, and 10 for, *inter alia*, respirators (the "'534 Registration").  *See* **Exhibits 5-6**.

30.     The '329 and '534 Registrations are valid, in effect, and on the Principal Trademark Register.

31.     The '329 and '534 Registrations are "incontestable" within the meaning of 15 U.S.C. § 1065.  Accordingly, the '329 and '534 Registrations constitute conclusive evidence of: (i) 3M's ownership of the 3M Marks; (ii) the validity of the 3M Marks; (iii) the validity of the registration of the 3M Marks; and (iv) 3M's exclusive right to use the 3M Marks throughout the United States for, *inter alia*, respirators.

32.     Plaintiff's famous 3M Marks do more than identify 3M as the exclusive source of goods and services offered thereunder.  Indeed, the famous 3M Marks also signify to consumers that 3M-brand products offered under the 3M Marks are of the highest quality and adhere to the strictest quality-control standards.  Now, more than ever, consumers rely on the famous 3M Marks' ability to signify that products offered under the 3M Marks are of the same high quality that consumers have come to expect of the 3M brand over the past century.

**C.      3M's Extensive Efforts to Assist With the Battle Against COVID-19**

33.     Medical professionals and first responders throughout the world are donning extensive PPE as they place their health and safety on the line in the battle against COVID-19.  As 3M states on the homepage of its website, it is "committed to getting personal protective equipment to healthcare workers":



34.     Among the PPE that 3M is providing to the heroic individuals on the front lines of the battle against COVID-19 are its 3M-brand N95 respirators.

35.     Inset, below, is an image of 3M's branded Model 8210 respirator:



36.     Authentic N95 respirators reduce exposure to airborne biological particles and liquid contamination when appropriately selected, fitted, and worn.

37.     Based on the exponential increase in demand for 3M-branded N95 respirators, 3M has invested in the necessary capital and resources to double its annual production of 1.1 billion N95 respirators.  *See* Exhs. 1, 2.  **What 3M has *not* done in the face of the global COVID-19 pandemic is increase its prices**.  *See id.*

38.     Unfortunately, certain third parties do not share 3M's sense of civic responsibility during this time of crisis.  Indeed, opportunistic third parties are seeking to exploit the increased demand for 3M-branded N95 respirators by offering to sell them for exorbitant prices, selling counterfeit versions of them, and accepting money for 3M-brand N95 respirators despite having no product to sell or never intending to deliver the product in the first place.

39.   Accordingly, to protect both consumers and healthcare workers on the front lines of the COVID-19 battle from deception and inferior products, to reduce time wasted by healthcare providers and procurement officers on scams, as well as to protect 3M's goodwill, reputation, and carefully curated 3M brand, 3M is working diligently with law enforcement, retail partners, and others to combat unethical and unlawful business practices related to 3M-brand N95 respirators. For example, in late-March 2020, 3M's Chief Executive Offer, Mike Roman, sent a letter to U.S. Attorney General, William Barr, and the President of the National Governor's Association, Larry Hogan of Maryland, to offer 3M's partnership in combatting price-gouging.  As shown in the inset image, additional examples of 3M's efforts to combat price-gouging, counterfeiting, and other unlawful conduct during COVID-19 include:

    a.   3M posted on its website the list price for its 3M-brand N95 respirators so that consumers can readily identify price-gouging (*See* **Exhibit 7**);

    b.   3M created a form on its website that consumers can use to report suspected incidents of price-gouging and counterfeiting (*See* **Exhibit 8**); and

    c.   3M created a fraud "hotline" that consumers can call to report suspect incidents of price-gouging and counterfeiting.



## II.   Defendant's Unlawful Conduct

40.   Despite 3M's extensive measures to combat price-gouging and counterfeiting of its 3M-brand N95 respirators, illicit activities by bad actors continue.  Defendant is a prime example of this unlawful behavior, which is damaging the 3M brand and public health and safety in a time of unprecedented crisis.

41.     According to promotional materials created and disseminated by Defendant, Defendant purports to have millions, if not billions, of 3M's N95 respirators available for sale to healthcare providers and other customers throughout the United States.

42.     Because Defendant is not an authorized 3M dealer or distributor and has no relationship with 3M, this claim is implausible at best.  But still, Defendant attempted to exploit the feelings of panic and desperation surrounding the COVID-19 public health emergency.

43.     On or before March 26, 2020, Defendant provided a purchase order form and a price list to its franchisees as described in paragraph 8 above.  Defendant instructed its franchisees to submit all orders for products on the price list, including "Face Mask N95 #8210 direct from 3M" to Defendant for handling.  Defendant authorized, instructed, and urged its franchisees to engage in the scheme detailed herein, sought to orchestrate those activities on a system-wide scale, and mandated the concealment of those activities via a written contract.  Defendant implemented the scheme through direct contact with potential customers as well as over social media.

44.     For example, on March 27, 2020, Virginia Cooper contacted CMC, a prominent Fresno-area healthcare provider, to advertise the availability of PPE products at exorbitant prices. Ms. Cooper provided a spreadsheet listing the availability of "Face Mask N95 #8210 direct from 3M."  *See* Exh. 3 (excerpted below).

| Personal Protective Equipment Product/Price List | | | 3-26-2020 |
|---|---|---|---|
| ITEM # | DESCRIPTION | MIN. QTY / unit | UNIT PRICE per each piece unless noted |
| 00A | Face Mask N95        #8210 direct from 3M | 10,000,000 ea. | $      4.95 |

45.     On March 30, 2020, Ms. Cooper provided CMC with a PowerPoint presentation containing "pictures, catalog codes, pricing and minimum requirements."  *See* Exh. 4.  The metadata on the pricing spreadsheet and the PowerPoint show that both documents were last modified by Alex Myers, the Los Angeles Regional Developer for RX2Live.  *See* **Exhibit 9** (excerpted below).

- 11 -

1
2
3
4
5
6



7   46.   Defendant's PowerPoint presentation expressly references two models of 3M-brand

8   N95 respirators:  Model 1860 and Model 8210.  The presentation, an excerpt of which is depicted

9   below, prominently displays a photo of a respirator bearing the 3M Mark.  The presentation also

10   represents that the respirators are "Direct from 3M" and that "3M requires payment in full before

11   order can be placed.  Payment is held in escrow until the order is completed."  Exh. 4, at p. 2.  None

12   of these statements are true.

13
14
15
16
17
18
19
20
21

22   47.   The contents of Defendant's above-referenced PowerPoint presentation are intended

23   to defraud, mislead and/or deceive a reasonable consumer into believing that Defendant is an

24   authorized distributor of 3M's products and/or has an association or affiliation with 3M, which is

25   not the case.  Defendant does not, and never has, represented 3M, and 3M has never authorized

26   Defendant or any other affiliates, agents, employees, or franchisees of Defendant to manufacture,

27   distribute, advertise, market, offer for sale, receive payments on 3M's behalf, escrow funds on 3M's

28   behalf, and/or sell 3M-brand N95 respirators.

48.     What is more, in an effort to profit from the public's dire need of PPE during the global COVID-19 pandemic, Defendant's quote of $5.20 per 3M brand, N95 Model 1860 respirator is more than quadruple 3M's posted list price of $1.27 per respirator. *See* Exhs. 4, 7.

49.     Defendant's quote of $4.95 per 3M brand, N95 Model 8210 respirator is approximately 4-5 times 3M's posted list price of $1.02-$1.31 per respirator. *See id.*

50.     Defendant understands that the scheme it undertook was wrong.  This is evident from early efforts to conceal the activities via the "Non-Circumvention, Non-Disclosure & Working Agreement" that Defendant provided to its franchisee network for use in conjunction with activities involving 3M N95 respirators and a long list of other products.  Furthermore, one business day after this action was filed, Defendant instructed its franchisees "to discontinue all sales activity of 3M masks."  There is no way to know if Defendant or its nationwide network of franchisees have actually discontinued their sales and marketing activities involving the 3M brand.

51.     Based on the foregoing, 3M seeks relief against Defendant for federal and state trademark infringement, unfair competition, false association, false endorsement, false designation of origin, trademark dilution, false advertising, and unlawful, unfair, and fraudulent business acts and practices.

## CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF

*(Trademark Infringement Under Section 32(1) of the Lanham Act, 15 U.S.C. § 1114(1))*

*(Infringement of the Federally Registered 3M Marks)*

52.     3M repeats and incorporates by reference the statements and allegations in paragraphs 1 – 51 of the Complaint as though set forth fully herein

53.     Count I is a claim for trademark infringement under 15 U.S.C. § 1114.

54.     3M is the exclusive owner of each of the federally registered 3M Marks.

55.     3M has the exclusive right to use each of the 3M Marks in United States commerce for, *inter alia*, advertising, promoting, offering for sale, and selling Plaintiff's 3M-brand N95 respirators.

56.     3M's exclusive rights in and to each of the 3M Marks predate any rights that Defendant could establish in and to any mark that consists of "3M" in whole and/or in part.

57.     Both of the 3M Marks are fanciful and/or arbitrary when used for respirators and, therefore, are inherently distinctive.

58.     Both of the 3M Marks identify 3M as the exclusive source of products offered under the 3M Marks (including, without limitation, 3M-brand N95 respirators) and, therefore, the 3M Marks have acquired distinctiveness.

59.     Defendant is using the 3M Marks in commerce to advertise, promote, offer for sale, and sell 3M-branded N95 respirators, including, for example, in communications to healthcare providers listing the products that Defendant purportedly has available for sale.

60.     Defendant's use of the 3M Marks in commerce on, for, and/or in connection with the advertising, promotion, offering for sale, and/or sale of products, as alleged, herein, is causing, and is likely to continue to cause, consumer confusion, mistake, and/or deception about whether Defendant is 3M, and/or whether Defendant is a licensee, authorized distributor, and/or affiliate of 3M and/or products that 3M offers under its 3M Marks, including, without limitation, 3M-brand N95 respirators.

61.     Defendant's use of the 3M Marks in commerce on, for, and/or in connection with the advertising, promotion, offering for sale, and/or sale of products, as alleged, herein, is causing, and is likely to continue cause, consumer confusion, mistake, and/or deception about whether Defendant and/or Defendant's products are affiliated, connected, and/or associated with 3M and/or products that 3M offers under its 3M Marks, including, without limitation, 3M-brand N95 respirators.

62.     Defendant's use of the 3M Marks in commerce on, for, and/or in connection with the advertising, promotion, offering for sale, and/or sale of products, as alleged, herein, is causing, and is likely to continue to cause, consumer confusion, mistake, and/or deception about whether Defendant and/or Defendant's products originate with, and/or are sponsored or approved by, and/or offered under a license from, 3M or vice versa.

63.     3M has not consented to the use of its famous 3M Marks by Defendant.

64.     Based on 3M's longstanding and continuous use of its 3M Marks in United States commerce, as well as the federal registration of the 3M Marks, Defendant had actual and constructive knowledge of 3M's superior rights in and to the 3M Marks when Defendant began using the 3M Marks as part its bad-faith scheme to confuse and deceive consumers, as alleged, herein.

65.     Upon information and belief, Defendant adopted and used the 3M Marks in furtherance of Defendant's willful, deliberate, and bad-faith scheme of trading upon the extensive consumer goodwill, reputation, fame, and commercial success of products that 3M offers under its 3M Marks, including, without limitation, 3M-brand N95 respirators.

66.     Upon information and belief, Defendant has made, and will continue to make, substantial profits and gain from its unauthorized use of the 3M Marks, to which Defendant is not entitled at law or in equity.

67.     Upon information and belief, Defendant's acts and conduct complained of herein constitute trademark infringement in violation of 15 U.S.C. § 1114(a).

68.     3M has suffered, and will continue to suffer, irreparable harm from Defendant's acts and conduct complained of herein, unless restrained by law.  The damage suffered by 3M is exacerbated by the fact that Defendant is advertising and offering for sale 3M-branded N95 respirators at exorbitantly inflated prices during a global pandemic when 3M's products are necessary to protect public health.  Such conduct has inspired intense public criticism of the manner in which 3M's respirators are being distributed and sold during the COVID-19 pandemic and significant confusion about 3M's role in the marketplace for masks that are essential to safeguarding public health.  Whereas 3M's corporate values and brand image center around the application of science to improve lives, Defendant's conduct imminently and irreparably harms 3M's brand.

69.     3M has no adequate remedy at law.

/ / /

/ / /

/ / /

**SECOND CLAIM FOR RELIEF**

*(Unfair Competition, False Endorsement, False Association, and False Designation of Origin*

*Under Section 43(a)(1)(A) of the Lanham Act, 15 U.S.C. § 1125(a)(1)(A))*

*(Use of the 3M Marks)*

70.     3M repeats and incorporates by reference the statements and allegations in paragraphs 1 – 69 of the Complaint as set forth fully herein.

71.     Count II is a claim for federal unfair competition, false endorsement, false association, and false designation of origin under 15 U.S.C. § 1125(a)(1)(A).

72.     Upon information and belief, Defendant's acts and conduct complained of herein constitute unfair competition, false endorsement, false association, and/or false designation of origin in violation of 15 U.S.C. § 1125(a)(1)(A).

73.     Upon information and belief, Defendant's use of Plaintiff's famous 3M Marks to advertise, market, offer for sale, and/or sell purported 3M-brand N95 respirators to consumers at exorbitant prices, in general, and during a global pandemic such as COVID-19, specifically, also constitutes unfair competition in violation of 15 U.S.C. § 1125(a)(1)(A).

74.     Defendant has also falsely held itself out to be an agent of and/or authorized by 3M to sell and/or distribute 3M-branded products, when this is not the case.

75.     3M has suffered, and will continue to suffer, irreparable harm from Defendant's acts and conduct complained of herein, unless restrained by law.

76.     3M has no adequate remedy at law.

**THIRD CLAIM FOR RELIEF**

*(Trademark Dilution Under Section 43(c) of the Lanham Act, 15 U.S.C. § 1125(c))*

*(Dilution of the Famous 3M Marks)*

77.     3M repeats and incorporates by reference the statements and allegations in paragraphs 1 – 76 of the Complaint as though set forth fully herein.

78.     Count III is a claim for federal trademark dilution under 15 U.S.C. § 1125(c).

79.     The 3M Marks were famous before and at the time Defendant began using the 3M Marks in commerce on, for, and/or in connection with the advertising, promotion, offering for sale, and/or sale of products (including, without limitation, 3M's branded N95 respirators).

80.     Defendant's use of Plaintiff's famous 3M Marks in commerce on, for, and/or in connection with the advertising, promotion, offering for sale, and/or sale of products (including, without limitation, 3M's branded N95 respirators) is likely to dilute the distinctive quality of the famous 3M Marks, such that the famous 3M Marks' established selling power and value will be whittled away.

81.     Defendant's use of Plaintiff's famous 3M Marks in commerce on, for, and/or in connection with the advertising, promotion, offering for sale, and/or sale of products (including, without limitation, 3M's branded N95 respirators) is likely to dilute the distinctive quality of the famous 3M Marks, such that the famous 3M Marks' ability to identify 3M as the exclusive source of products offered under the 3M Marks (including, without limitation, 3M's branded N95 respirators) will be whittled away.

82.     Defendant's use of Plaintiff's famous 3M Marks in commerce on, for, and/or in connection with the advertising, promotion, offering for sale, and/or sale of products (including, without limitation, 3M's branded N95 respirators) at exorbitant prices, in general, and during a global pandemic such as COVID-19, specifically is likely to dilute the reputation of the famous 3M Marks, such that the famous 3M Marks' established ability to indicate the superior quality of Products offered under such Marks (including, without limitation, 3M's branded N95 respirators), will be whittled away.

83.     Upon information and belief, Defendant's acts and conduct complained of herein constitute trademark dilution in violation of 15 U.S.C. § 1125(c).

84.     3M has suffered, and will continue to suffer, irreparable harm from Defendant's acts and conduct complained of herein, unless restrained by law.  The damage suffered by 3M is exacerbated by the fact that Defendant is advertising and offering for sale 3M-branded N95 respirators at exorbitantly inflated prices during a global pandemic when 3M's products are necessary to protect public health.  Such conduct has inspired intense public criticism of the manner

in which 3M's respirators are being distributed and sold during the COVID-19 pandemic and significant confusion about 3M's role in the marketplace for masks that are essential to safeguarding public health.  Whereas 3M's corporate values and brand image center around the application of science to improve lives, Defendant's conduct imminently and irreparably harms 3M's brand.

85.     3M has no adequate remedy at law.

**FOURTH CLAIM FOR RELIEF**

*(False Advertising Under Section 43(a)(1)(B) of the Lanham Act, 15 U.S.C. § 1125(a)(1)(B))*

*(Defendant's March 26 Instructions to Franchisees, and March 27 and 30 Emails)*

86.     3M repeats and incorporates by reference the statements and allegations in paragraphs 1 – 85 of the Complaint as though set forth fully herein.

87.     Count IV is a claim for false and deceptive advertising under 15 U.S.C. § 1125(a)(1)(B).

88.     The statements that Defendant made in its March 26 instructions to franchisees, March 27 and March 30 emails with CMC, and the PowerPoint presentation and pricing list provided to CMC, constitute commercial advertising and/or commercial promotion.

89.     The statements that Defendant made in its March 26 instructions to franchisees, March 27 and March 30 emails with CMC, and the PowerPoint presentation and pricing list provided to CMC, contained false, misleading, and/or deceptive statements about the nature, characteristics, qualities, and/or geographic origin of Defendant and/or the products that Defendant allegedly had available for sale.

90.     The statements that Defendant made in its March 26 instructions to franchisees, March 27 and March 30 emails with CMC, and the PowerPoint presentation and pricing list provided to CMC, contained false, misleading, and/or deceptive statements about the nature, characteristics, qualities, and/or geographic origin of 3M and the 3M-brand products, including, without limitation, 3M's branded N95 respirators.

91.     The false, misleading, and/or deceptive statements in Defendant's March 26 instructions to franchisees, March 27 and March 30 emails, PowerPoint presentation, and pricing list were material to CMC's purchasing decisions.

92.     Defendant placed the March 26 instructions to franchisees, March 27 and March 30 emails, PowerPoint presentation, and pricing list into interstate commerce by, *inter alia*, sending them to CMC

93.     Defendant's March 27 and March 30 emails, PowerPoint presentation, and pricing list have directly and/or proximately caused and/or are likely to cause 3M to suffer harm in the form of lost sales (including, without limitation, lost sales of 3M's branded N95 respirators), as well as irreparable diminution to the 3M brand and 3M Marks' reputation, fame, and goodwill.

94.     Upon information and belief, Defendant's acts and conduct complained of herein constitute false advertising in violation of 15 U.S.C. § 1125(a)(1)(B).

95.     3M has suffered, and will continue to suffer, irreparable harm from Defendant's acts and conduct complained of herein, unless restrained by law.  The damage suffered by 3M is exacerbated by the fact that Defendant is advertising and offering for sale 3M-branded N95 respirators at exorbitantly inflated prices during a global pandemic when 3M's products are necessary to protect public health.  Such conduct has inspired intense public criticism of the manner in which 3M's respirators are being distributed and sold during the COVID-19 pandemic and significant confusion about 3M's role in the marketplace for masks that are essential to safeguarding public health.  Whereas 3M's corporate values and brand image center around the application of science to improve lives, Defendant's conduct imminently and irreparably harms 3M's brand.

96.     3M has no adequate remedy at law.

/ / /

/ / /

/ / /

/ / /

/ / /

**FIFTH CLAIM FOR RELIEF**

*(Trademark Dilution, Cal. Bus. Prof. Code §§ 14247)*

*(Dilution of the Famous 3M Marks)*

97.     3M repeats and incorporates by reference the statements and allegations in paragraphs 1 – 96 of the Complaint as though set forth fully herein, including, but not limited to the Third Claim for Relief above.

98.     Count V is for trademark dilution under California Business and Professions Code § 14247.

99.     Upon information and belief, Defendant's acts and conduct complained of herein constitute trademark dilution under California Business and Professions Code § 14247.

100.     3M has suffered, and will continue to suffer, irreparable harm from Defendant's acts and conduct complained of herein, unless restrained by law..

101.     3M has no adequate remedy at law.

**SIXTH CLAIM FOR RELIEF**

*(Unfair Competition, Cal. Bus. Prof. Code §§ 17200 et seq.)*

*(Price-Gouging and False Advertising of 3M-branded Products)*

102.     3M repeats and incorporates by reference the statements and allegations in paragraphs 1 – 101 of the Complaint as though set forth fully herein.

103.     Count VI is for unfair competition in violation of California Business and Professions Code § 17200 *et seq.*

104.     On March 4, 2020, California Governor Gavin Newsome declared a state of emergency to exist in California in response to COVID-19.

105.     That same day, California Attorney General Xavier Becerra issued a price-gouging alert reminding all Californians that, under Penal Code § 396, price-gouging is illegal in all California communities during the declared state of emergency.

106.     On March 12, 2020, Governor Newsome issued an executive order further enhancing the ability of the California state and local government's ability to respond to COVID-19.

107.    On information and belief, Defendant sold or offered to sell consumer goods, emergency supplies, and medical supplies (including, but not limited to 3M's branded N95 respirators) for a price of more than 10 percent greater than the price charged by Defendant for those goods prior to the proclamation or declaration of emergency, in violation of Penal Code § 396.

108.    Defendant's violation of Penal Code § 396 constitutes an unlawful business practice and an act of unfair competition within the meaning of California Business & Professions Code § 17200 *et seq.* It is also a crime under California law.

109.    Defendant's unauthorized use in commerce of the 3M Marks is also likely to cause consumer confusion or mistake or to deceive consumers into believing that Defendant's products and/or services are sponsored by, endorsed by, or originate from 3M or are otherwise connected or affiliated with or approved by 3M, thereby causing loss, damage, and injury to 3M and to the purchasing public, constituting unlawful, unfair, and fraudulent business practices in violation of California Business & Professions Code § 17200 *et seq.*

110.    Defendant's marketing and advertisement of products with the 3M Marks and as coming "Direct from 3M" in the United States, as alleged herein, was intended to and did mislead 3M's customers and consumers to believe that such products were manufactured or distributed by, or authorized for manufacture or distribution by, 3M, in violation of California Business & Professions Code § 17500.

111.    This conduct, together with Defendant's other acts alleged herein constitute unfair, unlawful, and fraudulent business acts and practices under California Business and Professions Code § 17200, because such acts are forbidden by various state and federal laws and are unscrupulous, unfair, and injurious to 3M. Defendant's acts have irreparably damaged 3M and the consuming public and will continue to do so unless restrained by this Court, and 3M is without an adequate remedy at law.

112.    As a result of Defendant's wrongful conduct, 3M is entitled to, among other relief, an order enjoining and restraining Defendant from diverting, distributing, and selling the 3M-branded products and restoring to 3M any funds that were wrongfully collected by Defendant so

that those funds may be donated to a COVID-19 charitable organization(s)/cause(s) of 3M's choosing.

**SEVENTH CLAIM FOR RELIEF**

*(False Advertising, Cal. Bus. Prof. Code §§ 17500 et seq.)*

*(False Advertising of 3M-branded Products)*

113. 3M repeats and incorporates by reference the statements and allegations in paragraphs 1 – 112 of the Complaint as though set forth fully herein.

114. Count VII is for false advertising in violation of California Business and Professions Code § 17500 *et seq.*

115. As alleged herein, Defendant has engaged in and continue to engage in violations of California Business and Professions Code § 17500 by making or disseminating untrue or misleading statements, with the intent to induce the purchase of 3M-branded N95 respirators, when Defendant knew or by the exercise of reasonable care should have known the statements were untrue, misleading, and likely to deceive the reasonable consumer and the public. Defendant's untrue or misleading representations include, but are not limited to the following:

a. Representing that Defendant was an agent of and/or authorized by 3M to sell and/or distribute 3M-branded products.

b. Representing that Defendant could supply 3M-branded N95 respirators "Direct from 3M."

c. Representing that "3M requires payment in full before order can be placed."

d. Representing that "Payment is held in escrow until the order is completed."

e. Representing that Defendant had available for sale millions, if not billions, of 3M-branded N95 respirators and that the minimum order was 10 million units.

116. Such statements are untrue, false, and misleading because 3M has not authorized the use or direct sale of its 3M-branded products by Defendant. Likewise, 3M never authorized Defendant to accept deposits or payments on 3M's behalf or to hold any such funds in escrow.

117.    Defendant knew, or by the exercise of reasonable care should have known at the time of making the statements, or causing the statements to be made, that it was untrue or misleading to hold itself out as an authorized distributor of 3M's branded N95 respirators.

118.    Defendant engaged in the false and/or misleading advertising and marketing of the 3M-branded N95 respirators, as alleged herein, with the intent to directly or indirectly induce consumers to purchase those respirators.

119.    Had Defendant truthfully advertised that it was not authorized to sell 3M-branded products, consumers would not have purchased the products or would have purchased a different product from another manufacturer or distributor.

120.    This false and misleading advertising of 3M-branded products by Defendant presents a continuing threat to consumers, as such conduct is ongoing to this day.

121.    As a direct and proximate result of the aforementioned acts and omissions by Defendant, Defendant received and continue to hold monies rightfully belonging to 3M.

**EIGHTH CLAIM FOR RELIEF**

*(Unfair Competition and Trademark Infringement under California Common Law)*

*(Use of the 3M Marks)*

122.    3M repeats and incorporates by reference the statements and allegations in paragraphs 1 – 121 of the Complaint as though set forth fully herein.

123.    Count VIII is for unfair competition and trademark infringement under California common law.

124.    Upon information and belief, Defendant's acts and conduct complained of herein constitute unfair competition and trademark infringement in violation of California common law.

125.    3M has suffered, and will continue to suffer, irreparable harm from Defendant's acts and conduct complained of herein, unless restrained by law.

126.    3M has no adequate remedy at law.

/ / /

/ / /

/ / /

**PRAYER FOR RELIEF**

**WHERFORE**, based on Defendant's conduct complained of, herein, Plaintiff asks this Court:

A.     To enter an Order, finding in Plaintiff's favor on each Claim for Relief asserted herein;

B.     Pursuant to 15 U.S.C. § 1116:

1.  To preliminarily and permanently enjoin Defendant, its agents, servants, employees, officers and all persons and entities in active concert and participation with them from using the 3M Marks (or any other mark(s) confusingly similar thereto) for, on, and/or in connection with the manufacture, distribution, advertising, promoting, offering for sale, and/or sale of any goods or services, including, without limitation, 3M-brand N95 respirator Marks;

2.  To preliminarily and permanently enjoin Defendant, its agents, servants, employees, officers and all persons and entities in active concert and participation with them from falsely representing themselves as being distributors, authorized retailers, and/or licensees of 3M and/or any of 3M's products (including, without limitation, 3M-brand N95 respirator) and/or otherwise falsely representing to have an association or affiliation with, sponsorship by, and/or connection with, 3M and/or any of 3M's products; and

3.  To order Defendant to file with the Court and serve upon Plaintiff's counsel, within 30 days after service of the order of injunction, a report in writing under oath setting forth in detail the manner and form in which Defendant has complied with the injunction;

C.     Pursuant to 15 U.S.C. § 1117:

1.  To order Defendant to provide 3M with a full accounting of all manufacture, distribution and sale of products under the 3M Marks (including, without limitation, 3M-brand N95 respirators), as well as all profits derived therefrom;

2.  To order Defendant to disgorge and pay to 3M – so as to be donated charitably pursuant to subpart H, *infra* – all of Defendant's profits derived from the sale of infringing goods offered under the 3M Marks (including, without limitation, 3M-brand N95 respirators);

3.   To award 3M – so as to be donated charitably pursuant to subpart H, *infra* – treble damages in connection with Defendant's infringement of the 3M Marks;

4.   To find that Defendant's acts and conduct complained of herein render this case "exceptional"; and

5.   To award 3M – so as to be donated charitably pursuant to subpart H, *infra* – its costs and reasonable attorneys' fees incurred in this matter;

D.   Pursuant to 15 U.S.C. § 1118, to order the destruction of all unauthorized goods and materials within the possession, custody, and control of Defendant that bear, feature, and/or contain any copy or colorable imitation of 3M's Marks;

E.   To award restitution as authorized by law;

F.   To award Plaintiff pre-judgment and post-judgment interest against Defendant;

G.   To award Plaintiff such other relief that the Court deems just and equitable;

H.   To order that all monetary payments awarded to Plaintiff be donated to a COVID-19 charitable organization(s)/cause(s) of Plaintiff's choosing.

## **DEMAND FOR JURY TRIAL**

Plaintiff requests a trial by jury for all issues so triable pursuant to Fed. R. Civ. P. 38(b) and 38(c).

Dated: April 19, 2020

**MAYER BROWN LLP**

By: */s/ Carmine R. Zarlenga*

Carmine R. Zarlenga (*pro hac vice*)
*czarlenga@mayerbrown.com*
1999 K Street, N.W.
Washington, DC  20006-1101
Telephone:       (202) 263-3000
Facsimile:       (202) 263-3300

Dale Giali
*dgiali@mayerbrown.com*
Keri E. Borders
*kborders@mayerbrown.com*
350 South Grand Avenue, 25th Floor
Los Angeles, CA  90071-1503
Telephone:       (213) 229-9500
Facsimile:       (213) 625-0248

*Attorneys for Plaintiff 3M Company*

FIRST AMENDED COMPLAINT AND DEMAND FOR JURY TRIAL,
CASE NO. 1:20-CV-00523-NONE-SAB