MAYER BROWN LLP
CARMINE R. ZARLENGA (*pro hac vice*)
*czarlenga@mayerbrown.com*
1999 K Street, N.W.
Washington, DC  20006-1101
Telephone: (202) 263-3000
Facsimile:  (202) 263-3300

DALE GIALI (SBN 150382)
*dgiali@mayerbrown.com*
KERI E. BORDERS (SBN 194015)
*kborders@mayerbrown.com*
350 South Grand Avenue, 25th Floor
Los Angeles, CA  90071-1503
Telephone: (213) 229-9500
Facsimile:  (213) 625-0248

*Attorneys for Plaintiff 3M Company*

# UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| 3M COMPANY,<br><br>                    Plaintiff,<br><br>          vs.<br><br>RX2LIVE, LLC and RX2LIVE, INC.,<br><br>                    Defendants. | Case No. 1:20-cv-00523-NONE-SAB<br><br>**PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION FOR A TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION**<br><br>[*Filed concurrently with Plaintiff's Notice of Motion; Declaration of Dale Giali; Declaration of Carmine R. Zarlenga; Declaration of Charles Stobbie; Declaration of David A. Crist; and [Proposed] Order*]<br><br>Action Filed:  April 10, 2020<br>Amended Complaint Filed:  April 19, 2020<br>Jury Trial Demanded |

# TABLE OF CONTENTS

**Page**

I.   INTRODUCTION ................................................................................................. 1

II.  STATEMENT OF FACTS ................................................................................. 2

    A.   COVID-19 and the Current National Emergency .................................. 2

    B.   The Parties and the Products .................................................................. 3

        1.   3M and Its Famous Brand and Trademarks ............................... 3

        2.   3M's Production and Sale of N95 Respirators During COVID-19 ........... 4

        3.   Defendants and Their Purported Business ................................. 5

        4.   Defendants' False and Deceptive March 27-30 Offers to Community Medical Centers, Inc .................................................. 5

III. LEGAL STANDARD ....................................................................................... 7

IV.  LEGAL ANALYSIS ......................................................................................... 8

    A.   3M Will Suffer Immediate, Irreparable Harm if Defendants' Conduct Continues ............................................................................................. 8

    B.   3M is Likely to Succeed on the Merits of its Trademark-Related Claims ............ 9

        1.   The 3M Marks are Valid and Entitled to Protection ................. 10

        2.   Defendants' Use of the 3M Marks and Slogan is Likely to Cause Confusion .............................................................. 10

            a.   The First *Sleekcraft* Factor: the 3M Marks are Strong ................. 11

                i.   The 3M Marks are Conceptually Strong ......................... 11

                ii.   The 3M Marks are Commercially Strong and Famous ................. 12

            b.   The Second *Sleekcraft* Factor: Defendants Reproduced the 3M Marks on the Same Goods .................................................. 13

            c.   The Third *Sleekcraft* Factor: In the Era of COVID-19, Normally Prudent Purchasers Must Make Rash Purchasing Decisions ................................ 13

            d.   The Fourth *Sleekcraft* Factor: Defendants Reproduced the 3M Marks In Their Entirety .................................................. 13

            e.   The Fifth *Sleekcraft* Factor: Defendants Sell in 3M's Marketing Channel .................................................. 14

            f.   The Sixth *Sleekcraft* Factor: Defendants Actually Confused CMC .................................................. 14

            g.   The Seventh *Sleekcraft* Factor: Defendants Intentionally Selected the 3M Mark For Use on Their Products ................. 15

            h.   The Eighth *Sleekcraft* Factor: The Likelihood of Product Expansion is Relatively Unimportant on These Facts ................. 16

            i.   The Balance of *Sleekcraft* Factors Strongly Favors 3M ............... 16

-i-

**TABLE OF CONTENTS**
(continued)

Page

C.    The Balance of Hardships Tips Decidedly in 3M's Favor..................................... 16

    1.    Defendants Would Not Suffer any Hardship if this Court Grants 3M's Motion for a TRO and PI................................................. 17

    2.    3M Would Suffer Substantial Hardship in the Absence of a TRO and PI ......................................................................................... 18

D.    Issuing a TRO and PI Would Serve the Public's Interest in Avoiding Confusion ...................................................................................................... 18

E.    3M Should Not Be Required To Post A Bond ...................................................... 19

V.    CONCLUSION .............................................................................................................. 20

-ii-

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Disney Enters., Inc. v. VidAngel, Inc.*,
    869 F.3d 848 (9th Cir. 2017).............................................................................17

*3M Co. v. Christian Invs. LLC*,
    No. 1:11CV0627 ...............................................................................................12

*Alliance for the Wild Rockies v. Cottrell*,
    632 F.3d 1127 (9th Cir. 2011).............................................................................8

*Adidas Am., Inc. v. Skechers USA, Inc.*,
    890 F.3d 747 (9th Cir. 2018).............................................................................16

*AMF Inc. v. Sleekcraft Boats*,
    599 F.2d 341 (9th Cir. 1979)....................................................................... *passim*

*Brookfield Comm'ns, Inc. v. W. Coast Entm't Corp.*,
    174 F.3d 1036 (9th Cir. 1999)...........................................................11, 12, 13, 16

*Brooklyn Brewery Corp. v. Black Ops Brewing, Inc.*,
    156 F. Supp. 3d 1173 (E.D. Cal. 2016)........................................................8, 9, 18

*Cadence Design Sys., Inc. v. Avant! Corp.*,
    125 F.3d 824 (9th Cir. 1997).............................................................................17

*CytoSport, Inc. v. Vital Pharm., Inc.*,
    617 F. Supp. 2d 1051 (E.D. Cal. 2009)................................................................16

*E. & J. Gallo Winery v. Gallo Cattle Co.*,
    967 F.2d 1280 (9th Cir. 1992).............................................................................13

*Entrepreneur Media, Inc. v. Smith*,
    279 F.3d 1135 ............................................................................................12, 15

*FreshPoint Denver Inc. v. Trinity Fresh Distribution LLC*,
    2018 WL 6696676 (E.D. Cal. Dec. 20, 2018) ........................................................7

*GoTo.com, Inc. v. Walt Disney Co.*,
    202 F.3d 1199 (9th Cir. 2000).......................................................................13, 16

*Internet Specialties West, Inc. v. Milon-DiGiorgio Enterprises, Inc.*,
    559 F.3d 985 (9th Cir. 2009).............................................................................19

*JL Beverage Co., LLC v. Jim Beam Brands Co.*,
    828 F.3d 1098 (9th Cir. 2016).............................................................................11

-iii-

*Jorgensen v. Cassiday*,
    320 F.3d 906 (9th Cir. 2003)....................................................................19

*League of Wilderness Defenders/Blue Mountains Biodiversity Project v.*
    *Connaughton*,
    752 F.3d 755 (9th Cir. 2014)......................................................................9

*Life Alert Emergency Response, Inc. v. LifeWatch, Inc.*,
    601 F. App'x 469 (9th Cir. 2015) .............................................................18

*New West Corp. v. NYM Co. of California, Inc.*,
    595 F.2d 1194 (9th Cir. 1979)...................................................................10

*Ocean Garden, Inc. v. Marktrade Co., Inc.*,
    953 F.2d 500 (9th Cir. 1991).....................................................................11

*Official Airline Guides, Inc. v. Goss*,
    6 F.3d 1385 (9th Cir. 1993).......................................................................13

*One Indus., LLC v. Jim O'Neal Distributing, Inc.*,
    578 F.3d 1154 (9th Cir. 2009)...................................................................11

*Playboy Enters., Inc. v. Netscape Communications Corp.*,
    354 F.3d 1020 (9th Cir. 2004)...................................................................13

*Pom Wonderful LLC v. Hubbard*,
    775 F.3d 1118 (9th Cir. 2014)..........................................................8, 10, 11

*Rearden LLC v. Rearden Commerce, Inc.*,
    683 F.3d 1190 (9th Cir. 2012)...................................................................10

*Rhorabough v. California Dep't of Corr.*,
    2006 WL 2401928 (E.D. Cal. Aug. 18, 2006) ...........................................7

*Seed Servs., Inc. v. Winsor Grain, Inc.*,
    868 F. Supp. 2d 998 (E.D. Cal. 2012).......................................................19

*Silberstein v. Fox Entertainment Group, Inc.*,
    732 Fed. App'x 517 (9th Cir. 2018)..........................................................10

*Winter v. Natural Res. Defense Council*,
    555 U.S. 7 (2008) .......................................................................................8

**Statutes**

15 U.S.C. § 1065 ...............................................................................4, 10

15 U.S.C. § 1072 ......................................................................................15

15 U.S.C. § 1114(1) .................................................................................10

- iv -

15 U.S.C. § 1115(b) ...................................................................................................10

15 U.S.C. § 1125(a) ...................................................................................................10

Cal. Business and Professions Code §§ 17200 *et seq.* ...............................................17

Cal. Penal Code § 396 ..........................................................................................17, 19

**Other Authorities**

42 C.F.R. pt. 84 ...........................................................................................................3

Fed. R. Civ. P. 65 ................................................................................................19, 20

## I.   __INTRODUCTION__

The world currently faces the largest public health crisis in modern history.  The exponential growth in the number of COVID-19 cases in the United States has placed increased pressure on healthcare personnel to treat patients, regardless of access to proper personal protective equipment ("PPE").  3M's PPE products, including N95 respirators, are in immediate need to protect medical professionals, first responders, and others who are working on the front lines of the crisis.  As a leading provider of PPE, 3M is committed to getting its PPE in the hands of those who need it most in these unprecedented times.  To meet the growing demand, 3M has ramped up respirator production, but the demand still exceeds the supply.

Unscrupulous parties, such as Defendants, are using this time of desperation to fabricate false associations with 3M and trade off of 3M's famous brand and goodwill for self-gain—all at the immeasurable expense of 3M, but more importantly at the expense of healthcare workers, first responders, and the public at-large.  In this instance, Defendants are falsely portraying an affiliation with and authorization by 3M to sell 3M-branded products, and in doing so are offering N95 respirators to unwitting California companies and consumers at grossly inflated prices.  However, Defendants are not authorized distributors, agents, brokers, or vendors of 3M products, have no right to use 3M's famous 3M marks, and have no authority to make offers or solicit orders on 3M's behalf.  Defendants' exploitation of a global health disaster to confuse and deceive consumers into believing that Defendants are authorized representatives of 3M's products—and offering those products for sale at inflated prices—threatens immediate and irreparable harm to 3M's brand and to those desperately in need of PPE, including healthcare workers working on the front lines of COVID-19.

The damage to the famous 3M brand and its associated goodwill as a result of Defendants' unlawful conduct is immediate, immeasurable, and irreparable, and has the potential to define the 3M brand in the eyes of consumers for years to come.  Indeed, Defendants' offer to sell 3M-brand N95 respirators supposedly "direct from 3M" at a price that is 4-5 times higher than 3M's list price gives the false impression that 3M is inflating its prices and condoning price-gouging in the midst of a national emergency.  This is not the case, and is antithetical to 3M's organizational

1    mission and values.  In fact, 3M has not increased its prices for PPE in response to the pandemic,

2    despite costly measures to increase worldwide production.

3           Based on the foregoing, a temporary restraining order ("TRO") and preliminary injunction

4    ("PI") are fully warranted.  Indeed, on April 24, 2020, Judge Preska of the Southern District of

5    New York granted 3M's application for a temporary restraining order and an order to show cause

6    in a similar action brought by 3M against another unscrupulous pandemic profiteer in *3M Co. v.*

7    *Performance Supply, LLC*, No. 1:20-cv-2949 (LAP) (KNF).  *See* Giali Decl. ¶ 2, Ex. 1.  The court

8    did not require 3M to post a bond.  *Id.*

9           Absent injunctive relief, 3M is likely to suffer reputational damage and loss of goodwill

10   that would be impossible to quantify.  In this case and in other cases, healthcare providers and

11   procurement officers strapped for resources and operating in a crisis mode are confused and

12   misled by the false association tactics employed by bad actors such as Defendants.  Absent a TRO

13   and PI preventing Defendants from infringing and diluting 3M's trademarks, unfairly competing,

14   falsely claiming association with 3M, and engaging in false advertising and otherwise deceptive,

15   unlawful, unfair, and fraudulent business acts and practices, 3M will suffer immediate injury to

16   the goodwill and business reputation that it has worked for decades to build.  3M is also likely to

17   succeed on the merits of each of its claims, including, in particular, its federal and state claims for

18   trademark infringement and dilution, unfair competition, false endorsement, false association,

19   false designation of origin, false advertising, and unlawful, unfair, and fraudulent business acts

20   and practices, because Defendants are using 3M's name and goodwill without authorization or

21   endorsement from 3M, and for nefarious purposes that is causing immediate harm to 3M's name

22   and reputation.

23          Accordingly, this Court should grant 3M's Motion for a TRO and PI that prohibits

24   Defendants from such unlawful conduct, for which 3M has no adequate remedy at law.

25   **II.     STATEMENT OF FACTS**

26          **A.     COVID-19 and the Current National Emergency**

27          Over the last four months, the world has seen an outbreak of a highly contagious virus,

28   known as COVID-19, creating an international state of emergency.  The virus is believed to pass

1   from person-to-person via airborne particles and liquids.  *See* Giali Decl. at ¶ 3, Ex. 2.

2        Current guidelines recommend that healthcare personnel wear respiratory protection, like

3   3M's N95 respirator when interacting with infected patients in order to minimize the workers'

4   risk of exposure to the virus.  *See id.* at ¶ 4, Ex. 3.  According to the Center for Disease Control

5   and Prevention, reported illnesses resulting from exposure "range[] from very mild (including

6   some with no reported symptoms) to severe, including illness resulting in death."  *See id.* at

7   Ex. 2, p. 3.  The number of cases of COVID-19 increases every day in the United States.  *See id.*

8   at ¶ 5, Ex. 4.

9        N95 respirators can prevent virus-carrying particles from reaching the wearer when

10  appropriately selected, fitted, and worn over the mouth and nose.  *See* Stobbie Decl. at ¶ 5.  The

11  3M-branded N95 respirators are one of three respirator levels that meet the National Institute of

12  Occupational Safety and Health standards for minimum filtration efficiency levels as prescribed

13  by regulation 42 C.F.R. pt. 84.  *Id.*

14      **B.**    **The Parties and the Products**

15          **1.**    **3M and Its Famous Brand and Trademarks**

16        For decades, 3M has been a leading provider of personal protective equipment for

17  healthcare professionals, industry workers and the public.  *See* Stobbie Decl. at ¶ 4.  Indeed, 3M

18  is a leading manufacturer of N95 respirators, (*id.*), and has sold N95 respirators in the United

19  States under the 3M brand name for decades.  *See* Crist Decl. at ¶ 10.  Since the outbreak began,

20  the public has become familiar with 3M as a manufacturer of the N95 respirators and other

21  equipment essential to protecting healthcare personnel and workers from exposure to airborne

22  particles, including viruses like COVID-19.  *Id.* at ¶ 18; Stobbie Decl. at ¶ 13.

23        Over the past century, 3M has invested hundreds of millions of dollars in advertising,

24  promoting, offering for sale, and selling its vast array of goods and services under its standard-

25  character mark "3M" and 3M design mark **3M** (together, the "3M Marks")*.*  *See* Crist Decl.

26  at ¶ 10.  During this period, 3M's goods and services offered under its 3M Marks have been the

27  subject of widespread, unsolicited media coverage and critical acclaim.  *See id.* at ¶ 11.  Goods

28  and services offered under 3M Marks also enjoy enormous commercial success, with annual

1    revenues exceeding hundreds of millions of dollars.  *Id.* at ¶ 12.

2        To protect its rights over the 3M Marks, 3M has obtained numerous federal trademark

3    registrations for these marks, including but not limited to U.S. Trademark Reg. Nos.

4    (i) 3,398,329, covering the standard-character 3M mark for International Classes 9 and 10 for,

5    *inter alia*, respirators (the "'329 Registration") and (ii) 2,793,534, which covers the 3M design

6    mark in, *inter alia*, International Class 10 for respirators (the "'534 Registration").  *See id.* ¶¶ 13-

7    17, Exs. 4, 6.  The '329 and '534 Registrations are valid, in effect, and on the Principal

8    Trademark Register.  *See id*.  The '329 and '534 Registrations are "incontestable" within the

9    meaning of 15 U.S.C. § 1065.  *See id*. Exs. 5, 7.

10            **2.    3M's Production and Sale of N95 Respirators During COVID-19**

11           3M is proudly "on the front lines of COVID-19" providing the heroic individuals on the

12    front lines of the battle against COVID-19 with 3M-brand N95 respirators, which "are considered

13    the gold standard by medical workers and public-health officials."  Giali Decl. at ¶ 6, Ex. 5.



22           Since the outbreak of COVID-19 in early 2020, 3M has doubled its global output rate of

23    respirators (including N95 respirators) to 1.1 billion per year to ensure that an adequate supply of

24    its respirators is available to governments and healthcare personnel, as well as to workers in other

25    critical industries, including food, energy, and pharmaceuticals.  *See* Stobbie Decl. at ¶¶ 8, 9, Exs.

26    1-3.  In the last seven days of March 2020, 3M sent 10 million N95 respirators to healthcare

27    facilities around the United States.  *See id*. at ¶ 10, Ex. 1.  3M has also invested the necessary

28    capital and resources to double its current global production of 1.1 billion 3M-brand N95

1    respirators per year to 2 billion per year.  *See id*. at ¶ 11, Exs. 1, 3.

2          Notwithstanding the surging demand and public need for PPE during COVID-19, 3M has

3    confirmed publicly that it will not increase prices of its 3M-brand N95 respirators in authorized

4    sales and will work to eliminate price-gouging by third parties in the midst of this crisis.  *See id.*

5    at ¶ 12, Ex. 3; *see also id.* at ¶¶ 14-16.  These efforts protect the public from defective and/or

6    inferior products and outrageous and unwarranted price inflation.  *Id.*

7                 **3.       Defendants and Their Purported Business**

8          Defendants are RX2Live, Inc., a Wyoming corporation, and RX2Live, LLC, a limited

9    liability company of unknown registration, purportedly operating out of Pleasant Grove, Utah and

10   Highland, Utah.  *See* Giali Decl. at ¶¶ 12-14, Exs. 11-13.  Defendant RX2Live, Inc. owns all of

11   the assets of Defendant RX2Live, LLC.  *See id.* at ¶ 13, Ex. 12 at p. 1.  Defendants describe their

12   business as being a franchisor in healthcare services, providing healthcare professionals with

13   access to products and services, including *inter alia* workplace and wellness programs, chronic

14   care management, medication dispensing services, allergy therapy services, and DNA testing, and

15   weight loss and wellness products and services to the general public.  *See id.* at p. 2.  Defendants'

16   CEO, Mr. Brian Hazelgren, is a self-described Author, Entrepreneur, and Trainer.  *See id.* at ¶ 15,

17   Ex. 14.  In the wake of COVID-19, Defendants have offered to supply a range of PPE products to

18   hospitals and healthcare providers, including the counterfeit 3M-brand N95 respirators at issue in

19   this action, as well as other N95 respirators, surgical masks, nitrile and PVC gloves, hand

20   sanitizer, isolation gowns, and supposed COVID-19 test kits.  *See id.* at ¶¶ 16-17, Exs. 15-16.

21                 **4.       Defendants' False and Deceptive March 27-30 Offers to Community**

22                 **Medical Centers, Inc.**

23          Defendants are not, and have never been, licensed or authorized distributors, agents, or

24   representatives of 3M-branded N95 respirators.  *See* Crist Decl. at ¶ 20; Stobbie Decl. at ¶¶ 17-18.

25   Nor have Defendants ever had an association or affiliation with 3M.  *Id.*

26          Yet, in the midst of COVID-19, Defendants mobilized their entire franchise network of

27   approximately 68 franchises located in at least 14 states to offer 3M model nos. 1860 N95 and

28   8210 N95 respirators supposedly "direct from 3M" to health care customers at grossly inflated

prices.  *See* Giali Decl. at ¶ 18, Ex. 17.  To do so, Defendants equipped franchisees with a blank purchase order indicating that N95 respirators would be "direct from 3M" and an accompanying price list likewise indicating that 3M model no. 8210 respirators were available "direct from 3M" in large quantities and at the grossly inflated price of $4.95 per respirator (4-5 times above 3M's list price).  *Id.*  As Defendants had no means to secure any respirators "direct from 3M," these representations (and any further representations based on them) were false, deceptive, and harmful to 3M's trademarks, goodwill, and reputation.

To make matters worse, Defendants attempted to cover up and conceal all details related to transactions in the price-gouged 3M products through the use of a Non-Circumvention, Non-Disclosure & Working Agreement that Defendants also provided to their franchisees.  *Id.*  As a consequence, the full scope of Defendants' wrongdoing is unknown.

As one specific example, on or about March 27-30, 2020, Virginia Cooper, whom on information and belief is an employee or agent of Defendants, contacted a Fresno-based healthcare provider, Community Medical Centers, Inc. ("CMC"), to advertise for sale PPE products available through Defendants, including purported 3M-brand N95 respirators.  *See id*. at ¶¶ 16-17, Exs. 15-16.  Defendants represented that the respirators were "direct from 3M," and offered for sale "3M N95 1860" surgical respirators at $5.20 per unit (as compared to 3M's list price of $1.27 per unit) and "3M N95 8210" standard respirators at $4.95 per unit (as compared to 3M's list price of $1.02-$1.31 per unit), with minimum purchase requirements of 10 million masks.  *See id*. at ¶¶ 17, Ex. 16.

As shown in the table below, Defendants' mark-up is 4-5 times greater than 3M's listed prices:

| 3M Model | 3M's Per-Unit Price | Defendants' Per-Unit Price | Approx. Markup |
|---|---|---|---|
| 1860 | $1.27 | $5.20 | 309% |
| 8210 | $1.02-$1.31 | $4.95 | 278-385% |

Defendants reproduced 3M's Marks in a PowerPoint presentation provided to CMC.  *See id.*  3M's famous 3M design marks prominently appear in photographs of purported 3M-brand

1    N95 respirators.  *Id.*  The presentation also falsely represents that the respirators come "Direct

2    from 3M" and that "3M requires payment in full before order can be placed.  Payment is held in

3    escrow until the order is completed."  *Id.*  As stated, *supra*, Defendants are not, and have never

4    been, authorized distributors, vendors, or representatives of 3M's products.  *See* Crist Decl. at

5    ¶ 20; Stobbie Decl. at ¶¶ 17-18;.  Defendants also do not have, and have never had, an association

6    or affiliation with 3M.  *See id.*

7         Defendants' correspondence with franchisees and potential customers is permeated with

8    false, misleading, and/or deceptive statements, and there is nothing to prevent Defendants from

9    making similar offers to other customers around the United States, causing irreparable harm to the

10   3M brand and putting the public at risk.  Crist Decl. at ¶ 21-25; Stobbie Decl. at ¶¶ 17-18.

11        Based on the foregoing, 3M commenced this action against Defendants on April 10, 2020,

12   asserting claims under federal and California law for trademark infringement, unfair competition,

13   false endorsement, false association, false designation of origin, false advertising, and unlawful,

14   unfair, and fraudulent business acts and practices.  *See* Stobbie Decl. at ¶ 16; *see also* Dkt No. 1.[1]

15   After learning that in January 2019, Defendant RX2Live, Inc. acquired all of the assets of

16   Defendant RX2Live, LLC, on April 19, 3M promptly amended its complaint to add Defendant

17   RX2Live, Inc.  *See* Dkt. No. 8.  The Summons issued from the Court on April 20, and 3M duly

18   served Defendants with the Summons and First Amended Complaint that same day.

19   **III.    LEGAL STANDARD**

20        3M seeks a TRO and PI against Defendants' use of the famous 3M Marks in conjunction

21   with price-gouging.  In the Ninth Circuit, "[t]emporary restraining orders are emergency

22   measures, intended to preserve the status quo pending a fuller hearing on the injunctive relief

23   requested."  *FreshPoint Denver, Inc. v. Trinity Fresh Distribution LLC*, No. 2:18-cv-03183-JAM-

24   EFB, 2018 WL 6696676, at *2 (E.D. Cal. Dec. 20, 2018).  "[R]equests for temporary restraining

25   orders are governed by the same general standards that govern the issuance of a preliminary

26   injunction."  *Rhorabough v. Cal. Dep't of Corr.*, No. CIV S-05-1541-DFL-CMK-P, 2006 WL

27

28   [1] The Summons on 3M's initial complaint issued from the Court on April 13, and 3M duly served
     Defendant RX2Live, LLC on April 15.  *See* Dkt. No. 12.

2401928, at *1 (E.D. Cal. Aug. 18, 2006).  A party is entitled to a preliminary injunction if it shows that (1) it is "likely to succeed on the merits"; (2) it is "likely to suffer irreparable harm in the absence of preliminary relief"; (3) "the balance of equities tips in [its] favor"; and (4) "an injunction is in the public interest."  *Winter v. Natural Res. Defense Council*, 555 U.S. 7, 20 (2008); *see also Pom Wonderful LLC v. Hubbard*, 775 F.3d 1118, 1124 (9th Cir. 2014).

Of particular significance here and now, harm both to parties within a lawsuit *and to the public* may be considered when determining if failure to issue a preliminary injunction will result in irreparable harm.  *Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1138 (9th Cir. 2011) (public interest in preserving nature and avoiding irreparable environmental injury weighed in favor of preliminary injunction against proposed logging and timber sale in area damaged by fire).

For the reasons cited herein, 3M is entitled to a TRO and PI because it will likely succeed on the merits of its claims; it faces immediate, irreparable harm in the absence of swift injunctive relief and the balance of equities favors issuing the requested injunctive relief.   Additionally, harm to the public from trademark infringement, false advertising, and price-gouging is readily apparent.

## IV.   **LEGAL ANALYSIS**

### A.   **3M Will Suffer Immediate, Irreparable Harm if Defendants' Conduct Continues**

Irreparable harm is harm that "can seldom be adequately remedied by money damages and is often permanent or at least of long duration."  *Id.* (citation omitted); *see also Brooklyn Brewery Corp. v. Black Ops Brewing, Inc.*, 156 F. Supp. 3d 1173, 1185 (E.D. Cal. 2016) ("Irreparable harm must be of a peculiar nature, so that compensation in money alone cannot atone for it.") (citation omitted).  Here, Defendants' conduct is likely to create immediate *and* continuing irreparable harm to the widespread fame and goodwill of the 3M brand and famous 3M Marks, which are synonymous with superior quality.  This is not a coincidence.  For more than a century, 3M has invested hundreds of millions of dollars in advertising and marketing products under its 3M Marks.  *See* Crist Decl. at ¶ 10.  3M also implements rigorous quality-control standards to

1   ensure that all products offered under its famous 3M Marks are consistent and of the highest

2   quality.  *Id.* at ¶ 9.

3          3M should not have its carefully curated brand and reputation left to the devices of

4   unsavory characters, like the Defendants.  Yet, that is precisely what will happen in the absence

5   of an injunction.  Indeed, Defendants are not an authorized distributors, agents, or representatives

6   of 3M products, including 3M-brand N95 respirators.  Nonetheless, Defendants are using the

7   famous 3M Marks to create the false impression that they are authorized to solicit large orders for

8   N95 respirators at grossly inflated prices on 3M's behalf.  Significantly, Defendants are not alone

9   in their price-gouging quest.  Other parties are attempting similar scams and 3M is actively

10  investigating and/or pursuing claims against these bad actors.  *See* Giali Decl. at ¶¶ 2, 9-11,

11  Exs. 1, 8-10.

12         3M's inability to control Defendants' use of the famous 3M Marks and Defendants'

13  suggested affiliation with 3M imperils 3M's brand and reputation—and irreparably so.  *See* Crist

14  Decl. at ¶¶ 21-25.  To be sure, 3M cannot control whether products offered for sale and/or sold

15  outside of its authorized trade channels adhere to 3M's rigorous standards.  *See id.*  What is more,

16  no amount of money could repair the damage to 3M's brand and reputation if it is associated with

17  deviating from its superior quality standards and the crime of price-gouging at the expense of

18  healthcare workers and other first responders during COVID-19.  *Id.*  This constitutes textbook

19  irreparable harm.  *See*, *e.g.*, *Brooklyn Brewery Corp.*, 156 F. Supp. 3d at 1185 ("In trademark

20  cases, courts have found irreparable harm in the loss of control of a business's reputation, a loss

21  of trade and loss of goodwill.") (citation omitted).

22         Based on the foregoing, 3M has established irreparable harm.

23  **B.      3M is Likely to Succeed on the Merits of its Trademark-Related Claims**

24         To obtain a TRO and preliminary injunction, 3M must establish a likelihood of success on

25  the merits of only one of its claims.  *See League of Wilderness Defenders/Blue Mountains*

26  *Biodiversity Project v. Connaughton*, 752 F.3d 755, 760 (9th Cir. 2014) ("We first analyze

27  whether the . . . plaintiffs are likely to succeed on the merits of any of their claims").

28  Nonetheless, because the same standard governs 3M's claims for trademark infringement, unfair

competition, false endorsement, false association, and false designation of origin under Sections 32 and 43(a)(1)(a) of the Lanham Act, and California common law (collectively, the "Claims"), 3M analyzes these Claims together for purposes of the instant Motion. *See Silberstein v. Fox Entm't Grp., Inc.*, 732 F. App'x 519, 517, (9th Cir. 2018) ("The tests for infringement of a federally registered mark under § 32(1), 15 U.S.C. § 1114(1), infringement of a common law trademark, unfair competition under § 43(a), 15 U.S.C. § 1125(a), and common law unfair competition involving trademarks are the same.") (citation omitted); *Rearden LLC v. Rearden Commerce, Inc.*, 683 F.3d 1190, 1221 (9th Cir. 2012) ("It is undisputed that [plaintiff's] state law trademark infringement claim (as well as their claim under the UCL to the extent it is based on infringement grounds) is subject to the same legal standards as their Lanham Act trademark claim."); *New West Corp. v. NYM Co. of Cal., Inc.*, 595 F.2d 1194, 1201 (9th Cir. 1979) ("Whether we call the violation infringement, unfair competition or false designation of origin, the test is identical—is there a 'likelihood of confusion?'").

3M's Claims require satisfaction of two elements: (1) ownership of a trademark, and (2) that 3M show a likelihood of confusion through the balancing of the eight factors laid out in *AMF Inc. v. Sleekcraft Boats.* 599 F.2d 341, 348-349 (9th Cir. 1979); *see also Pom Wonderful*, 775 F.3d at 1124.

**1.    The 3M Marks are Valid and Entitled to Protection**

3M's incontestable '329 and '534 Registrations constitute *conclusive* evidence of, *inter alia*, 3M's ownership, and the validity, of the 3M Marks. *See* 15 U.S.C. § 1115(b); *accord* 15 U.S.C. § 1065, *Pom Wonderful*, 775 F.3d at 1124. Accordingly, 3M is likely to establish the first element of its Claims.

**2.    Defendants' Use of the 3M Marks and Slogan is Likely to Cause Confusion**

To demonstrate a likelihood of success on the merits, 3M must also show that a reasonably prudent consumer in the marketplace is likely to be confused as to the origin of Defendants' products and to associate those products with 3M. *Pom Wonderful*, 775 F.3d at 1125. Courts in the Ninth Circuit look to the following eight *Sleekcraft* factors for guidance in

- 10 -

1    assessing the likelihood of consumer confusion: "(1) strength of the protected mark; (2) proximity

2    and relatedness of the goods; (3) type of goods and the degree of consumer care; (4) similarity of

3    the protected mark and the allegedly infringing mark; (5) marketing channel convergence; (6)

4    evidence of actual consumer confusion; (7) defendant's intent in selecting the allegedly infringing

5    mark; and (8) likelihood of product expansion." *Id.* (referencing *Sleekcraft*, 599 F.2d at 348-49).

6    As demonstrated below, the balance of the relevant *Sleekcraft* factors weighs overwhelmingly in

7    3M's favor and 3M is likely to show a likelihood of consumer confusion.

8                    **a.      The First *Sleekcraft* Factor: the 3M Marks are Strong**

9            The strength of a mark is determined by its distinctiveness.  *See Pom Wonderful*, 775 F.3d

10   at 1126.  "The stronger a mark—meaning the more likely it is to be remembered and associated in

11   the public mind with the mark's owner—the greater the protection it is accorded by the trademark

12   laws." *Brookfield Comm'ns, Inc. v. W. Coast Entm't Corp.*, 174 F.3d 1036, 1058 (9th Cir. 1999).

13   A mark's strength is evaluated in terms of its conceptual strength and commercial strength.  *JL*

14   *Beverage Co., LLC v. Jim Beam Brands Co.*, 828 F.3d 1098, 1106 (9th Cir. 2016).

15                   **i.      The 3M Marks are Conceptually Strong**

16           A mark's conceptual strength "depends largely on the obviousness of its connection to the

17   good or service to which it refers." *Id.* at 1107 (citation omitted).  "Marks can be conceptually

18   classified along a spectrum of generally increasing inherent distinctiveness as generic,

19   descriptive, suggestive, arbitrary, or fanciful." *Brookfield*, 174 F.3d at 1058.

20           "3M" is not a word, and has no inherent relationship to the goods or services for which the

21   marks are used, namely, N95 respirators.  Accordingly, the 3M Marks are fanciful and, thus,

22   inherently distinctive when used for respirators.  *One Indus., LLC v. Jim O'Neal Distrib.,, Inc.*,

23   578 F.3d 1154, 1164 (9th Cir. 2009) ("fanciful" marks are those that "have no intrinsic

24   connection to the product with which the mark is used" and consist of "wholly made-up terms")

25   (citation omitted); *Ocean Garden, Inc. v. Marktrade Co., Inc.*, 953 F.2d 500, 506 (9th Cir. 1991)

26   ("A strong mark is inherently distinctive, for example, an arbitrary or fanciful mark; it will be

27   afforded the widest ambit of protection.") (citation omitted).

28   / / /

1

          **ii.**        **The 3M Marks are Commercially Strong and Famous**

2

       A mark's commercial strength takes into account a mark's "actual marketplace

3 recognition." *Brookfield*, 174 F.3d at 1058 ("[P]lacement within the conceptual distinctiveness

4 spectrum is not the only determinant of a mark's strength"; actual marketplace recognition can

5 "transform a suggestive mark into a strong mark"); *see also Entrepreneur Media, Inc. v. Smith*,

6 279 F.3d 1135, 1144 (9th Cir. 2002) ("[A]lthough a suggestive or descriptive mark . . . is

7 inherently a weak mark, it 'may be strengthened by such factors as extensive advertising, length

8 of exclusive use, public recognition . . . .'") (citations omitted).

9

       Even in the absence of 3M's incontestable registrations, 3M is likely to establish that its

10 3M Marks have acquired secondary meaning.  As discussed above, 3M has spent millions of

11 dollars in advertising, marketing, and promoting goods and services under the 3M Marks; goods

12 sold under the 3M Marks, including 3M's N95 respirators, generate hundreds of millions of

13 dollars in annual revenue; the 3M Marks are recognized and well-known in households around

14 the U.S.; and 3M has been the exclusive source of goods and services offered under the 3M

15 Marks for several decades.  Crist Decl. at ¶¶ 8-12, 18; Stobbie Decl. at ¶ 4.

16

       Several courts throughout the country have held that the foregoing establishes the

17 commercial strength of the 3M Marks.  *See*, *e.g.*, *3M Co. v. Christian Invs. LLC*, No.

18 1:11CV0627 TSE/JFA, 2012 WL 6561732, at *8-9 (E.D. Va. July 12, 2012) ("The 3M mark is

19 not only distinctive, it has become a famous mark through the long use and promotion by the

20 plaintiff . . .  Plaintiff has used the 3M mark since 1906, it offers more than 50,000 products and

21 services in a wide variety of fields and markets under the 3M mark, the 3M mark is distinctive

22 and distinguishes the source of plaintiff's products and services, and plaintiff has obtained

23 hundreds of registrations for the 3M mark for numerous products and services").

24

       Based on the foregoing, the first *Sleekcraft* factor favors 3M.

25 / / /

26 / / /

27 / / /

28 / / /

- 12 -

**b.**     **The Second *Sleekcraft* Factor: Defendants Reproduced the 3M Marks on the Same Goods**

"Where goods are related or complementary, the danger of consumer confusion is heightened."  *E. & J. Gallo Winery v. Gallo Cattle Co.*, 967 F.2d 1280, 1291 (9th Cir. 1992); *see also Brookfield*, 174 F.3d at 1055 ("Related goods are generally more likely than unrelated goods to confuse the public as to the producers of the goods.").  Here, as discussed above, Defendants aim to offer the same N95 respirators that 3M already offers under the respective Marks.  It has become commonplace knowledge that 3M manufactures N95 respirators.  Defendants' offering of N95 respirators under the 3M Marks heightens the likelihood of consumers confusing the source of products from Defendants as originating from 3M.  *Id.* ("In light of the virtual identity of marks, if they were used with identical products or services likelihood of confusion would follow as a matter of course.").

**c.**     **The Third *Sleekcraft* Factor: In the Era of COVID-19, Normally Prudent Purchasers Must Make Rash Purchasing Decisions**

"In assessing whether there is a likelihood of confusion, courts look to the reasonably prudent purchaser exercising ordinary caution."  *Official Airline Guides, Inc. v. Goss*, 6 F.3d 1385, 1393 (9th Cir. 1993).  Low consumer care increases the likelihood of confusion.  *Playboy Enters., Inc. v. Netscape Commc'ns Corp.*, 354 F.3d 1020, 1028 (9th Cir. 2004).  In the current state of emergency, even ordinarily cautious purchasers – such as hospitals and healthcare providers – are not able to take the time necessary to exercise extensive caution when searching for life-saving N95 respirators and other PPE.  Accordingly, in this unique environment, this *Sleekcraft* factor favors 3M.

**d.**     **The Fourth *Sleekcraft* Factor: Defendants Reproduced the 3M Marks In Their Entirety**

Defendants reproduced the 3M Marks in their entirety in the PowerPoint presentation that was used to market the purported 3M N95 respirators to customers, such as CMC.  Accordingly, the fourth *Sleekcraft* factor favors 3M.  *GoTo.com, Inc. v. Walt Disney Co.*, 202 F.3d 1199, 1206

1  (9th Cir. 2000) ("Quibbles over trivial distinctions between these two logos are unimpressive.

2  The logos are glaringly similar.").

3              **e.       The Fifth *Sleekcraft* Factor: Defendants Sell in 3M's Marketing**

4                      **Channel**

5          The fifth *Sleekcraft* factor addresses whether the products were sold in the same marketing

6  channels.  *Sleekcraft*, 599 F.2d at 353.  This factor undoubtedly weighs in favor of 3M.

7  Defendants' sale of N95 respirators to the same class of purchasers as 3M's sale of legitimate 3M

8  N95 respirators and Defendants' representation that the N95 respirators came "direct from 3M" is

9  strong evidence of marketing channel convergence.  *See id.* (finding convergent marketing

10 channels where sales by plaintiff and defendant were made through authorized retail dealers and

11 the general class of purchasers exposed to the products overlapped).

12             **f.       The Sixth *Sleekcraft* Factor: Defendants Actually Confused**

13                     **CMC**

14         Under the sixth *Sleekcraft* factor, evidence that the use of the two marks has already led to

15 confusion is persuasive proof that future confusion is likely.  *Sleekcraft*, 599 F.2d at 352.  Here,

16 there is evidence that Defendants sufficiently confused Tiffani Quinto, a contract coordinator at

17 CMC in Fresno, to lead her to ask for follow up on 3M N95 masks.  *See* Giali Decl. at ¶ 19,

18 Ex. 18.  Ms. Quinto, then contacted 3M stating, "[a]ttached is the email communications from a

19 supplier named RX2Life [*sic*] ***I'm not sure if this is an authorized supplier***."  *See id.* at ¶ 20,

20

21

22

23

24

25

26

27

28

Ex. 19 (emphasis added).  A clearer case of actual confusion would be difficult to conceive.



From: Tiffani Quinto <TQuinto@communitymedical.org>
Sent: Friday, April 03, 2020 3:53 PM
To: Paul Whittall <pvwhittall@mmm.com>
Subject: [EXTERNAL] Counterfeit/Unauthorized Supplier 3M N95s - RX2Life

Paul,
Attached is the email communications from a supplier named RX2Life
I'm not sure if this is an authorized supplier. But they are wanting a minimum purchase of 10million the 3M 8210 masks @ $4.95/each

**** If your organization has any information on available NRFit products, please send to my attention in a separate email ****

Tiffani Quinto Morales, MBA
Community Medical Centers
Supply Chain Management – Contract Coordinator
1630 E Shaw, Suite 176 (Bldg F),
Fresno, CA 93710
Office: (559) 724-4487

PREMIER | ASCEND
Community Medical Centers is an owner/member of Premier Inc. and participates in the Premier ASCEND Program.

If you are a vendor, have you registered to become compliant with CRMC's, GHX Vendor Tracking Program?  If not, please proceed to the GHX web site to register at https://login.ghx.com/identity-service/login.

If you have questions, please contact our Vendor tracking program administrator, Sandra Poulter, Materials Supply/Equip Evaluation Coordinator at 559-459-7098 spoulter@communitymedical.org

### g.   The Seventh *Sleekcraft* Factor: Defendants Intentionally Selected the 3M Mark For Use on Their Products

Although an "intent to confuse consumers is not required for a finding of trademark infringement," an "intent to deceive is strong evidence of a likelihood of confusion." *Entrepreneur*, 279 F.3d at 1148 (citations omitted).  "When the alleged infringer knowingly adopts a mark similar to another's, reviewing courts presume that the defendant can accomplish his purpose: that is, that the public will be deceived." *Sleekcraft*, 599 F.2d at 354 (citations omitted).  "The point is not that an intent to confuse is relevant as some measure of culpability. Rather, the alleged infringer's judgment as to what is likely to be confusing is relevant because it may well be accurate." *Entrepreneur*, 279 F.3d at 1148.

Prior to the rise of COVID-19, 3M's federal trademark registrations placed Defendants on constructive notice of 3M's superior rights in and to, among other things, the 3M Marks.  *See* 15 U.S.C. § 1072 ("Registration of a mark on the principal register [constitutes] constructive notice of the registrant's claim of ownership thereof").  Subsequent to COVID-19, 3M's manufacture and sale of N95 respirators has become common, household knowledge, with government

1  officials like President Donald Trump and Vice President Mike Pence drawing extensive attention

2  to 3M and its respirator masks over the last month.  *See* Giali Decl. at ¶ 7, Ex. 6.

3       Accordingly, there is no question that Defendants adopted, copied, and used the 3M

4  Marks with actual knowledge of 3M's rights therein.  Thus, there is likewise no question that

5  Defendants used (and continue to use) the 3M Marks to confuse consumers and exploit the

6  Marks' widespread fame and goodwill.  Based on the foregoing, the seventh *Sleekcraft* factor

7  favors 3M.  *CytoSport, Inc. v. Vital Pharm., Inc.*, 617 F. Supp. 2d 1051, 1073 (E.D. Cal. 2009),

8  *aff'd*, 348 F. App'x 288 (9th Cir. 2009) ("Such copying is strong evidence of a desire to confuse

9  the marketplace and trade on [the plaintiff's] goodwill and brand name."); *see also Adidas Am.,*

10  *Inc. v. Skechers USA, Inc.*, 890 F.3d 747, 758 (9th Cir. 2018) ("When one party knowingly adopts

11  a mark similar to another's, reviewing courts presume that the defendant will accomplish its

12  purpose, and that the public will be deceived.").

13          **h.**     **The Eighth *Sleekcraft* Factor: The Likelihood of Product**

14                     **Expansion is Relatively Unimportant on These Facts**

15       "The likelihood of expansion in product lines factor is relatively unimportant where two

16  companies already compete to a significant extent."  *GoTo.com*, 202 F.3d at 1209 (quoting

17  *Brookfield*, 174 F.3d at 1060).  Here, the N95 respirators produced by 3M and the N95 respirators

18  advertised by Defendants already compete for sales, and accordingly, this factor is neutral.

19          **i.**     **The Balance of *Sleekcraft* Factors Strongly Favors 3M**

20       In sum, the balance of relevant *Sleekcraft* factors weigh heavily in 3M's favor.  As in

21  *Sleekcraft*, "[w]hen the goods produced by the alleged infringer compete for sales with those of

22  the trademark owner, infringement usually will be found if the marks are sufficiently similar that

23  confusion can be expected."  *Sleekcraft*, 599 F.2d at 348.  Such a showing establishes that 3M is

24  likely to succeed on the merits of its federal and state trademark infringement and unfair

25  competition claims.

26      **C.**     **The Balance of Hardships Tips Decidedly in 3M's Favor**

27       Defendants would not suffer any hardship if this Court restrains and enjoins them from

28  engaging in unlawful and unscrupulous activity with respect to 3M's brand and 3M Marks; 3M,

1   on the other hand, would suffer substantial hardship if Defendants continue to irreparably harm

2   the 3M brand and 3M Marks via their unlawful activity.

3              **1.      Defendants Would Not Suffer any Hardship if this Court Grants 3M's**

4                       **Motion for a TRO and PI**

5              3M's Motion concerns Defendants' recent use of the 3M brand and 3M Marks during the

6   global COVID-19 pandemic in a manner that creates the false impression that Defendants are

7   authorized representatives of 3M and/or 3M's products.  3M's Motion also concerns Defendants'

8   recent decision to offer to sell purported 3M-brand N95 respirators to resource-strapped

9   customers at exorbitant prices that far exceed the excessive pricing prohibited under California's

10  price-gouging law and constitute unlawful and unfair business practices in violation of California

11  Business and Professions Code §§ 17200 *et seq.*  Penal Code §§ 396(b) (making it unlawful to

12  sell or offer to sell any consumer goods, emergency supplies, or medical supplies for a price of

13  more than 10 percent greater than the price charged by that person for those goods immediately

14  prior to the declaration of emergency); 396(i) ("A violation of this section shall constitute an

15  unlawful business practice and an act of unfair competition within the meaning of Section 17200

16  of the Business and Professions Code.").

17             Put simply, it would not be a "hardship" for Defendants to refrain from engaging in

18  unlawful activities related to 3M's brand (which constitute, *inter alia*, trademark infringement,

19  false association, and price-gouging in violation of California Penal Code § 396 and California

20  Business and Professions Code §§ 17200 *et seq.*).  This is especially true given that Defendants

21  sell products unrelated to 3M's brand (*e.g.*, other PPE and wellness services), and could continue

22  doing so even if this Court grants 3M's Motion.  *See Disney Enters., Inc. v. VidAngel, Inc.*, 869

23  F.3d 848, 867 (9th Cir. 2017) (relying on "long-settled principle that harm caused by illegal

24  conduct does not merit significant equitable protection");  *Cadence Design Sys., Inc. v. Avant!*

25  *Corp.*, 125 F.3d 824, 829 (9th Cir. 1997) ("In this circuit, as well as in other circuits, a defendant

26  who knowingly infringes another's copyright 'cannot complain of the harm that will befall it

27  when properly forced to desist from its infringing activities.'") (citation omitted).

28

2.    **3M Would Suffer Substantial Hardship in the Absence of a TRO and PI**

Unlike Defendants, 3M would suffer substantial hardship in the absence of a TRO and PI. Indeed, as discussed *passim*, Defendants' unlawful conduct is irreparably harming and tarnishing the 3M brand, as well as the widespread fame, goodwill, and reputation enjoyed by the famous 3M Marks. *See* Giali Decl. at ¶ 8, Ex. 7; Crist Decl. ¶¶ 21-25. Accordingly, the balance of hardships tips decidedly in 3M's favor. *See Life Alert Emergency Response, Inc. v. LifeWatch, Inc.*, 601 F. App'x 469, 473-74 (9th Cir. 2015) (a declaration detailing "the numerous and persistent complaints from would-be customers who received robo-calls for what they believed were [plaintiff's] products" substantiated the "threat to [plaintiff's] reputation and good will" and supported a finding of irreparable harm); *Brooklyn Brewery*, 156 F. Supp. 3d at 1185 ("Grounds for finding irreparable injury include loss of control of reputation, loss of trade, and loss of good will.") (citation omitted).

D.    **Issuing a TRO and PI Would Serve the Public's Interest in Avoiding Confusion**

During the current COVID-19 pandemic, consumers and healthcare providers, including those here in California, understandably lack the time and resources they would have in normal purchasing environments to ensure that sellers are who they purport to be (*e.g.*, authorized distributors of 3M-brand products), and that products are what sellers claim they are (*e.g.*, genuine 3M-brand products). Accordingly, when the public sees purported 3M-brand N95 respirators available for sale, they are relying on the 3M Marks and standards associated with the 3M brand now, more than ever, to indicate that the respirators offered for sale are, in fact, genuine and adhere to the 3M brand's rigorous standards.

Sellers, such as Defendants, are seeking to exploit the fact that consumers are making rapid purchasing decisions during COVID-19 by falsely representing themselves as authorized distributors of 3M-brand products, as well as offering to sell those products at exorbitantly high prices. Not only is this unlawful conduct likely to confuse and deceive the public about the source and quality of purported 3M-brand products offered under the 3M Marks, but also it

- 18 -

1  creates an overall purchasing environment that is materially different from, and irreparably

2  harms, the carefully curated 3M brand and customer experience.

3       Accordingly, unless this Court restrains and enjoins Defendants' unlawful conduct, the

4  public will continue to suffer harm in the form of confusion and deception about the source and

5  quality of the purported 3M-brand N95 respirators that Defendants are offering to sell for

6  exorbitantly high prices.  *Internet Specialties W., Inc. v. Milon-DiGiorgio Enters., Inc.*, 559 F.3d

7  985, 993 n.5 (9th Cir. 2009) ("The public has an interest in avoiding confusion between two

8  companies' products."); *Seed Servs., Inc. v. Winsor Grain, Inc.*, 868 F. Supp. 2d 998, 1005 (E.D.

9  Cal. 2012) ("The public interest in preventing trademark infringement is avoiding confusion in

10 the marketplace[,]" even where no product has yet been distributed and only inquiries have been

11 made); Cal. Penal Code § 396(a) ("[W]hen a declared state of emergency or local emergency

12 results in abnormal disruptions of the market, the public interest requires that excessive and

13 unjustified increases in the prices of essential consumer goods and services be prohibited.").

14      **E.**    **3M Should Not Be Required To Post A Bond**

15      Federal Rule of Civil Procedure 65(c) provides that "[t]he court may issue a preliminary

16 injunction or a temporary restraining order only if the movant gives security in an amount that the

17 court considers proper to pay the costs and damages sustained by any party found to have been

18 wrongfully enjoined or restrained."  Fed. R. Civ. P. 65(c).  This Court has wide discretion in

19 setting the amount of the bond and may dispense with the posting of a bond entirely "when it

20 concludes there is no realistic likelihood of harm to the defendant from enjoining his or her

21 conduct."  *Jorgensen v. Cassiday*, 320 F.3d 906, 919 (9th Cir. 2003).

22      No one, and especially not Defendants, will suffer any harm if the Court grants the

23 requested TRO and preliminary injunction and enjoins Defendants' deceptive, unlawful, unfair,

24 and infringing activities.  Furthermore, 3M has more than sufficient financial resources to cover

25 any harm resulting from an improvidently granted injunction.  A bond is superfluous in these

26 circumstances.

27 / / /

28 / / /

## V.      **CONCLUSION**

Based on the foregoing, 3M respectfully requests that this Court grant the enclosed [Proposed] Order to Show Cause, which temporarily restrains and preliminarily enjoins Defendants' use of the 3M Marks pursuant to Fed. R. Civ. P. 65(a)-(b).  3M also respectfully requests any further relief the Court deems just and equitable.

Dated:  April 27, 2020

**MAYER BROWN LLP**
Carmine R. Zarlenga
Dale J. Giali
Keri E. Borders

By: */s/ Carmine R. Zarlenga*
Carmine R. Zarlenga

*Attorneys for Plaintiff 3M Company*

- 20 -